MR. JUSTICE MORRISON
dissenting:
I respectfully dissent from the majority opinion.
The majority opinion does not adequately present the record. The question before this Court is whether there was substantial credible evidence to support a finding that Yanzick was unfit to teach. Yanzick was a tenured teacher and in the absence of evidence demonstrating his unfitness termination was impermissible.
The Board of Trustees gave its reasons for non-renewal by letter dated March 24, 1977:
“1. The Board of Trustees believe that you have demonstrated a lack of fitness for teaching in the position in which you have been employed and such a lack of fitness as indicated in all statements made to your class of Junior High School students between the ages of 11 and 14 years, with the effect that your ‘girlfriend’ had to move out of your home because some people did not like your living arrangements. *400 which statements were made under circumstances where it was common knowledge to your students and some of their parents that you and Miss Sharon Scott, a physical education teacher in the Poison School district, were living together at that time in your home in Poison, Montana.
“2. The Board of Trustees believe [sic] you have further demonstrated a lack of fitness for the teaching position in which you have been employed by reason of your introduction of the subject of abortion in your classroom, wherein you inquired of the boys in your class, ages 11 to 14, ‘How many of you boys would have your girlfriend get an abortion if she were pregnant?’
“3. The Board further feels that you have also demonstrated a lack of fitness for employment in the teaching position by a serious lack of good judgment in permitting the use in your classroom of human fetuses brought by one of your students who had obtained them without authorization from St. Joseph’s Hospital Laboratory without the knowledge of the administration of that hospital or of the owner of the specimens.
“4. The Board of Trustees further believe [sic] that you have demonstrated a lack of moral values by openly and notoriously cohabitating with a female teacher, not your wife, within the relatively small community of Poison, Montana, which fact, and the knowledge of which fact among your students, has adversely affected your performance as a teacher.
“5. The Board is of the opinion that you lack fitness for the classroom teaching position in which you have been employed because of the lack of respect for you as a teacher which has developed among your students as a consequence of the above- mentioned occurrences.”
Yanzick appealed the adverse recommendation by the school board to the County Superintendent of Schools. The County Superintendent held a hearing. She concluded that Yanzick had not demonstrated a lack of fitness by having made the statement regarding abortion nor had lack of fitness been demonstrated by showing that Yanzick displayed human fetuses to his classes on human reproduction. However, the County Superintendent did uphold the school board’s deter *401 mination that Yanzick was unfit to teach because of his relationship with a teacher to whom he was not married.
Yanzick then appealed to the Superintendent of Public Instruction. She concluded that there was substantial evidence to support the County Superintendent’s reasons for termination based upon Yanzick’s living arrangement. The issues of abortion and fetus demonstration were not discussed.
The decision of the State Superintendent was appealed to the District Court. Judge Gordon Bennett reversed the State Superintendent’s decision and remanded the matter to the County Superintendent for revision of her findings and conclusions. Judge Bennett also ordered that Yanzick be reinstated and paid lost wages.
Yanzick was a teacher of seventh grade science and math at Poison Middle School and had taught there for seven years. Some time during the 1975-76 school year, Yanzick and a young woman began dating. At that time the young woman was living on the west shore of Flathead Lake and Yanzick was living in his camper. In September of 1976, she moved in Yanzick’s house as a rent- paying tenant. Yanzick remained in his camper which was parked within 15 feet of the house. The problem of the living arrangement first came to the attention of the School Superintendent, Dr. Christensen, on January 18, 1977, when he received a call from Mrs. Herreid, a parent, complaining about Yanzick and the young woman’s living relationship. She stated that she had heard the school children talking about their living arrangement. That same day, Dr. Christensen called a meeting with Yanzick and Mr. Dupuis, the school principal. They discussed the living arrangement between Yanzick and the young woman. A discussion ensued which led the school officials to believe that the two were actually living together. Yanzick was concerned about students talking about his living situation and decided to have the young woman move out of the house, which she did. On January 26, Mrs. Herreid called Dr. Christensen again complaining that her son stated that Yanzick told the class that his girlfriend moved out because people objected to their living arrangement. On February 2, she called again complaining that Yanzick told her son’s class that “Nobody is going to take *402 cheap shots at me. I can sleep and eat wherever I please.” Yanzick admitted making the statement to his class about his girlfriend moving out because of objections voiced by others, but denied making the other statement. There was no corroboration for Mrs. Herreid’s testimony. Yanzick did respond to a student’s question about his personal relationship by telling the class that his personal life was not a subject for classroom discussion. On March 10, 1977, another parent had an informal discussion with Dr. Christensen, complaining that Yanzick’s relationship with the young woman was a bad influence on his daughter, who now felt that living with a man out of wedlock was an acceptable way of life.
At the hearing before the County Superintendent only one other parent testified on behalf of the school board. That person testified that his daughter told him that Yanzick said the subject of his personal life was nobody else’s business. The school board did not have any students testify.
In making findings of fact, the District Court said:
“The finding that the petitioner and Miss Scott were living together out of wedlock and that this arrangement was a matter of public knowledge is clearly erroneous in view of the reliable, probative and substantial evidence. The evidence to the contrary is overwhelming. Mr. Yanzick testified that he never lived with Miss Scott before they were married (tr. 230). Miss Scott also so testified (tr. 388). Four rent checks paid by Miss Scott to the petitioner for the months she lived in his house were admitted into evidence (petitioner’s exhibit E). Three witnesses, Jim Sturm, Clay Herrin and Dennis Day testified that they were friends of the petitioner’s, spent time with him and never observed him and Miss Scott cohabitating (tr. 173,174, 346, 380). Not one single witness testified that he knew that the petitioner and Miss Scott were in fact living together. Not a single parent who testified had any idea as to the source of their information, or their childrens’ information, about the living arrangement or its basis in fact (tr. 117, 128, 187, 188). There is no evidence that the petitioner ever told his classes that he was living with Miss Scott. The evidence on the record compels the conclusion that the petitioner and Miss Scott did not live together during the 1976-77 *403 school year. The ‘public knowledge within the school community’ was nothing but rumor. There is simply no basis in fact on the record to reach any other conclusion. It is evident that the petitioner misled the school officials at the January 18, 1977, meeting into believing that he was cohabiting with Miss Scott (when asked if they were living together, he replied, ‘You might say so.’) (tr. 232), but we certainly cannot attribute that meeting to the spread of rumors in the town. No one can deny that small towns usually make excellent breeding grounds for rumors. The town of Poison is evidently no exception. A year before this controversy erupted Dr. Christensen and Mr. Funk, another board member, observed the petitioner and Miss Scott crossing the Poison bridge together a number of times early in the morning (Miss Scott lived on the west shore at that time and crossed the bridge to get into town). Dr. Christensen warned him about being more discrete with his relationship with Miss Scott, although he did not inquire as to the status of their relationship (tr. 50, 52). This bridge crossing incident was also discussed at the January 18th meeting (a year later), as causing talk in the community (tr. 60). The bridge crossing issue was clarified, without conflicting evidence, by Miss Scott: (The petitioner drove Miss Scott to school three times when she had car trouble) (tr. 400, 401). Thus, based on the evidence in the record, the ‘common knowledge’ of the community was only rumor with absolutely no proven basis and fact. . .”
There is some evidence in the record to support a finding that Yanzick and Miss Scott cohabitated out of wedlock. However, the only basis is the admission made by Mr. Yanzick. It is not entirely clear from Yanzick’s testimony whether he was being facetious or whether they actually cohabitated in the sense charged by the school board.
Cohabitation out of wedlock does not render one an unfit teacher. The problem with this case is that there is no “substantial credible evidence” to show that Yanzick’s private life had an adverse effect upon his teaching. Any such finding by the County Superintendent was necessarily based upon hearsay testimony. The hearing had to be conducted pursuant to the statutory rules of evidence, sections 20-3-210(2), *404 2-4-612(2), MCA. Hearsay testimony could not provide the basis for a finding that Yanzick’s private living arrangements adversely affected his teaching.
In fact, the uncontradicted testimony is to the contrary. The school district could not offer any proof to show diminished performance on the part of Yanzick. The school superintendent and principal both felt that he was an average or better teacher. Mr. Dupuis, his immediate supervisor, recommended his being retained as late as March 1,1977. Ralph Campbell, a board member, never received any complaints about Yanzick and testified that he was a very skilled teacher.
The law governing the school board in this matter was stated by the Montana Supreme Court in Board of Trustees of School District No. 9, Glacier County v. The Superintendent of Public Instruction (1977), 171 Mont. 323, 327, 557 P.2d 1048, wherein the Court s aid:
“ While school boards are not bound to strict conformity with court rules and practices, they must, nevertheless, observe the elementary and fundamental principles of judicial inquiry. And although a degree of informality may attend the administrative proceedings, it must appear that the dismissal is based upon evidence supporting the specific charge or charges against the teacher and upon no other evidence. * *
Such evidence before the school board was lacking. Furthermore, the proceedings before the County Superintendent were not informal and were bound by the statutory rules of evidence, as previously indicated.
The record in this case fails to reveal a single witness with first hand knowledge which would substantiate a finding that Yanzick was unfit to teach. While there may have been evidence he was cohabitating with Miss Scott, this, in and of itself, would not provide a sufficient basis for his termination.
I believe that school boards should be afforded a great deal of latitude in governing local school districts. However, in my opinion, the Court is countenancing a “witch hunt” in this case. The Court is condoning a legal determination based upon rumor and hearsay. In doing so, the security of tenure has been dealt a serious blow. The precedential effect will necessarily diminish academic freedom in Montana.
For the foregoing reasons, I register a vigorous dissent.